Keith Fichtelman (SBN 262476)
**NELSON COMIS KETTLE & KINNEY LLP**
5811 Olivas Park Drive, Suite 202
Ventura, California 93003
Telephone: 805.604.4100
Facsimile: 805.604.4150
Email: kfichtelman@calattys.com

Attorneys for Plaintiff Bohbot, LLC

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| BOHBOT, LLC, a New York Limited Liability Company;<br><br>Plaintiff,<br><br>v.<br><br>ENTREPRENEUR CONSULTING SERVICES, LLC, a California Limited Liability Company;<br><br>Defendant. | Case No.: 8:23-cv-1265<br><br>**COMPLAINT FOR:**<br>1. **BREACH OF CONTRACT**<br>2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>3. **QUANTUM MERUIT**<br>4. **UNJUST ENRICHMENT**<br>5. **DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff BOHBOT, LLC ("Bohbot" or "Plaintiff") hereby brings this Complaint against ENTREPRENEUR CONSULTING SERVICES, LLC ("ECS" or "Defendant") for damages as follows:

1. This action arises out of a business relationship between Bohbot and ECS whereby Bohbot provided consulting services as an independent contractor for ECS's debt advisory services. Bohbot provided numerous services relating to debt financing for ECS's clients and other general support to ECS itself (such as marketing, training, invoicing, etc.). Bohbot and ECS's relationship began as a "handshake deal" in 2018 and evolved into a written contract in 2022. Under both the "handshake deal" and the written contract, Bohbot was to receive a defined percentage of ECS's revenue for financing projects.[1] Such share began as about 10% in 2019 and steadily increased to 25% by 2022.

2. Inexplicably, ECS decided to terminate the contractual relationship in January 2023 and has since refused to pay Bohbot compensation owed for services provided by Bohbot. Such unpaid compensation may exceed $2 million. This action arises as a result.

## PARTIES

3. Bohbot is a limited liability company organized under the laws of New York with a principal place of business in New York, New York. Bohbot's principal is an experienced businessman with over 10 years of experience in debt capital markets and mergers and acquisitions.

4. ECS is a limited liability company organized under the laws of the state of California with a principal place of business in Seal Beach, California.

---

[1] The original "handshake deal" provided for payment by ECS to Bohbot of a set monthly payment and share of revenue, both of which increased over time, whereas the later written agreement provided only for a revenue share.

## JURISDICTION AND VENUE

5. This Court has personal jurisdiction over Defendant as it is incorporated in and has its principal place of business in the State of California.

6. This Court has subject matter jurisdiction over this matter pursuant to Title 28 of the United States Code section 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

7. Venue is proper in this Court under Title 28 of the United States Code section 1391 as Defendant is based within this judicial district. Venue is proper in the Southern Division as the Defendant's principal place of business is located in the County of Orange.

## GENERAL ALLEGATIONS

8. Beginning in or about February 2018, Bohbot agreed to provide consulting services to ECS as an independent contractor. Initially, this working relationship was not formalized in a written agreement, but under their "handshake deal" Bohbot was to provide services to ECS in exchange for a monthly service fee and a share of ECS's revenues. Initially the revenue share amounted to just over 10%.[2]

9. ECS provides debt financing support for its clients. ECS's revenue is primarily derived from success fees relating to its clients' projects. Such success fee would be a percentage of the total committed debt facility as specified in ECS's engagement letters with its clients.

10. Typically, ECS provides up-front support services to its clients and then receives compensation only when the deal is ultimately financed. It is not uncommon for services on such deal to significantly precede compensation being paid to ECS.

---

[2] Details of the "handshake deal" are provided for context and background.

- 3 -
COMPLAINT

NELSON COMIS KETTLE & KINNEY LLP
5811 Olivas Park Drive, Suite 202
Ventura, California 93003

11. Bohbot's services to ECS generally consisted of debt financing deal support on a per-project basis and providing other general support (marketing, invoicing, training, etc.) to ECS on an ongoing basis.

12. Examples of the type of work that Bohbot provided to ECS involved, but are not limited to, services related to financing projects including creating lender materials from company data and information, conducting lender outreach and screening, distributing underwriting materials and facilitating lender data room access, managing lender during due diligence, evaluating and negotiating term sheets, supporting credit agreement negotiation, coordinating lender meetings, closing lender due diligence support (closing financing statements, opening balance sheets, etc.) as well as services dedicated to growing ECS – HR/employee training/onboarding; creation of marketing materials; new customer / business development; client invoicing / customer success (post-close support / relationship management).

13. Bohbot's relationship with ECS proved to be very productive and lucrative for both parties. Accordingly, Bohbot's responsibilities and profit shares increased over time.

14. For instance, at the outset of the relationship, ECS identified Bohbot as one of its "associates." This evolved to ECS referring to Bohbot as a Senior Vice-President by 2021 and a Director in 2022. It was discussed that Bohbot would assume the title of "partner" beginning in 2023.

15. Similarly, Bohbot's profit share began at just over 10% in 2019, 15% in 2020, and 21% in 2021.

16. In or around January 2022, Bohbot and ECS decided to enter into a written agreement to govern their working relationship moving forward. Bohbot and ECS therefore entered into a Consulting Services Agreement ("CSA") dated

January 31, 2022. A copy of the CSA is attached hereto as Exhibit 1 and its terms are incorporated herein as though set forth in full.

17. The intention of the parties was that the CSA would generally formalize their then existing working relationship. Consistent with their prior "handshake deal," Bohbot was to be paid on a per-project basis by receiving a percentage of the revenue ECS received from a particular project. Under the CSA, Bohbot was to no longer receive a flat monthly payment as it had under the "handshake deal", but Bohbot was to receive an increased revenue share instead.

18. Pursuant to section 4 of the CSA, Bohbot was to receive 50% of the revenue directly attributable to financings sourced exclusively by Bohbot and 25% of all other revenues. Section 5 of the CSA specifies that such payments were to be made "as soon as practicable" following ECS's receipt of payment for a financing project.

19. Such payments were owed to Bohbot as compensation for work performed during the term of the CSA and the parties understood this to mean that Bohbot would be paid such percentages when the specific project was financed. Thus, due to the nature of services often significantly preceding compensation being paid, Bohbot was to be compensated for his work during the term of the CSA even if compensation was ultimately paid to ECS after the term of the CSA expired. This was consistent with how the parties had operated throughout their business relationship.

20. Indeed, section 19 of the CSA specifies that "ECS's total obligation to Bohbot shall be to pay for Services rendered to ECS through the date of termination that have not been previously paid."

21. The term of the CSA was to be for one year and could be extended by mutual agreement of the parties.

22. Historically, it was common for ECS's debt financing deals to be financed, and ECS to be compensated, in the 2nd half of the year. Indeed, in 2020 and 2021, between 80 and 92% of ECS's compensation was paid during the 3rd and 4th quarters of each year. Accordingly, in excess of 80% of Bohbot's compensation from ECS during those years was also paid in the 3rd and 4th quarters.

23. For the years 2019-22, Bohbot's compensation from ECS was paid as follows:

| Year | 1Q | 2Q | 3Q | 4Q | Total | % Paid 3Q+4Q |
|---|---|---|---|---|---|---|
| 2019 | $29,081 | $11,500 | $21,980 | $69,547 | $132,108 | 69% |
| 2020 | $13,500 | $25,575 | $17,890 | $274,264 | $331,229 | 88% |
| 2021 | $10,500 | $40,858 | $164,605 | $459,050 | $675,013 | 92% |
| 2022 | $150,000 | $276,537 | - 0 - | - 0 - | $426,537 | - 0 - |

24. During the first two quarters of 2022, Bohbot was paid over $425,000 in compensation by ECS under the terms of the CSA for projects financed during that period. Based on historical percentages, Bohbot would have expected compensation in excess of $1.7 million to be paid during the 3rd and 4th quarters of 2022. Indeed, based on projects that were expected to close during that period, Bohbot had expected to be paid compensation in excess of $1.9 million.

25. Due to delays in the credit market and/or delays intentionally caused by ECS, however, the closings of projects that had been expected to be financed in the 3rd and 4th quarters of 2022 were instead pushed into 2023. Nevertheless, significant, if not the majority, of work on such projects had already been completed prior to the end of 2022, mostly by Bohbot.

26. This led to Bohbot receiving no compensation whatsoever in the final 7 months of 2022 despite performing significant and valuable work for ECS.

27. Beginning in mid-2022, the parties had entered into discussions of entering into a longer-term agreement prior to the expiration of the CSA. During such discussions, ECS had indicated that it would allow Bohbot to use the title of "Partner" moving forward.

28. ECS had consistently indicated that it was very pleased with the quality of Bohbot's work and consistently indicated that it envisioned a long-term future working with Bohbot. Indeed, ECS did not criticize any of Bohbot's work during the course of their business relationship.

29. By January 2023, however, ECS had seemingly decided to try to circumvent its payment obligations to Bohbot. ECS seemingly decided to try to take advantage of the delays in financing projects in late 2022 by terminating its relationship with Bohbot and, for the first time, claiming that Bohbot would not receive any share of revenue for the pending projects as the revenue was not received during the term of the CSA. Such a position was entirely contrary to the parties' prior understanding of Bohbot's compensation under the CSA and their years' long practice of conducting business.

30. On or about January 18, 2023, ECS informed Bohbot that ECS was terminating the CSA. Quickly thereafter, ECS removed Bohbot from communications regarding projects and would not allow Bohbot to continue providing services even through the end of the term of the CSA.

31. In short, ECS has wrongfully refused to provide compensation to Bohbot for Bohbot's significant, unpaid, work on numerous projects. While the exact amount of compensation will need to be determined in discovery, it is expected that upwards of $2 million is owed by ECS to Bohbot.

# FIRST CAUSE OF ACTION
# BREACH OF CONTRACT

32. Bohbot realleges and incorporates by reference the allegations set forth in the foregoing paragraphs above as though set forth fully herein.

33. Bohbot and ECS entered into a written agreement, the CSA, dated January 31, 2022.

34. Bohbot has performed all of its obligations under the CSA and/or was prevented from performing its obligations by ECS.

35. ECS has breached the terms of the CSA by, among other possible things, improperly terminating the CSA, without cause, prior to the expiration of its term and by failing to pay compensation owed to Bohbot per the terms of the CSA.

36. Section 4 of the CSA specifies the compensation that Bohbot was entitled to receive for services performed for ECS – a specific percentage of gross revenues received by ECS for its projects.

37. Section 5 of the CSA specifies that compensation was to be paid from ECS to Bohbot "as soon as practicable" after ECS received payment associated with financing deals.

38. Section 19 of the CSA clearly indicates that the Parties' expectations were that ECS was obligated to pay Bohbot for all services rendered to ECS through the date of termination. Due to the nature of the capital finance business and the typical delays between the conclusion of primary work and date of financing, both Parties understood that the structure and timing for the payment of fees under the CSA could result in Bohbot being owed compensation from ECS after the expiration of the term of the CSA.

39. As a proximate result of ECS's breaches of the CSA, Bohbot has been damaged in an exact amount to be proven at trial but believed to be upwards of $2 million.

## SECOND CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

40. Bohbot realleges and incorporates by reference the allegations set forth in the foregoing paragraphs above as though set forth fully herein.

41. Every contract entered into under California law has an implied covenant of good faith and fair dealing.

42. In entering into the CSA, the parties intended for Bohbot to be properly compensated for work performed on ECS's projects by receiving an identified share of ECS's revenue for each such project.

43. It was the parties' intent that Bohbot would be compensated accordingly for all work that Bohbot performed during the term of the CSA by receiving a share of the revenue generated from such projects.

44. ECS breached the implied covenant by refusing to pay Bohbot compensation due under the CSA for work performed by Bohbot during the term of the CSA.

45. On information and belief, ECS further breached the implied covenant by denying Bohbot his expected benefits under the CSA by causing delays to the financing of projects in order to ensure that they would close after the term of the CSA with an intent to then advance its new argument that Bohbot would not be entitled to compensation, contrary to the parties' prior understanding and practices.

46. As a proximate result of ECS's breaches of the implied covenant, Bohbot has been damaged in an exact amount to be proven at trial but believed to be upward of $2 million.

### THIRD CAUSE OF ACTION
### QUANTUM MERUIT

47. Bohbot realleges and incorporates by reference the allegations set forth in the foregoing paragraphs above as though set forth fully herein.

48. Within the past 2 years, ECS requested that Bohbot perform various services for the benefit of ECS.

49. Bohbot performed the services requested by ECS.

50. For a significant amount of such services, Bohbot did not receive any compensation from ECS.

51. The reasonable value of such unpaid services will be proven in an exact amount at trial but is believed to be upwards of $2 million.

### FOURTH CASE OF ACTION
### UNJUST ENRICHMENT

52. Bohbot realleges and incorporates by reference the allegations set forth in the foregoing paragraphs above as though set forth fully herein.

53. Bohbot provided valuable services to ECS which assisted ECS in completing debt financing projects that allowed ECS to realize millions of dollars in revenue.

54. Despite ECS receiving the benefits of Bohbot's work and labor, ECS has failed to appropriately or adequately compensate Bohbot for such services.

55. At all relevant times, ECS understood that Bohbot was providing such services with the expectation that ECS would be compensating Bohbot for all of such services.

56. It would be inequitable to allow ECS to retain the benefits of Bohbot's services without providing fair compensation for such services.

57. Accordingly, Bohbot is owed an exact amount to be proven at trial but believed to be upwards of $2 million.

## FIFTH CAUSE OF ACTION
## DECLARATORY RELIEF

58. Bohbot realleges and incorporates by reference the allegations set forth in the foregoing paragraphs above as though set forth fully herein.

59. An actual controversy has arisen between Bohbot and ECS regarding the legal rights and duties of the parties under the terms of the CSA.

60. Specifically, Bohbot claims that it is owed compensation under the CSA for work performed during the term of CSA even if the deal is financed and ECS is paid after the term of the CSA expired or was terminated. ECS denies that Bohbot is owed any compensation for any deal that was financed and ECS was paid after the expiration of the term of the CSA or it was terminated.

61. Bohbot is therefore entitled to a declaration from the Court that it is owed compensation pursuant to the terms of the CSA for work performed during the term of the CSA even if the subject deal is financed and ECS is paid after the term of the CSA expired or it was terminated.

## PRAYER

Wherefore, Bohbot prays for judgment and relief from the Court as follows:

a. Compensatory damages in an amount to be proven at trial, but believed to be upwards of $2,000,000;

b. A declaration that Bohbot is owed compensation pursuant to the terms of the CSA for work performed during the term of the CSA

even if the subject deal is financed and ECS is paid after the CSA was terminated or its term expired.

    c. Costs of suit, including reasonable attorneys' fees if allowed by law;

    d. Interest as allowable under applicable law;

    e. For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all causes of action and issues that are triable by a jury.

Dated: July 14, 2023

**NELSON COMIS KETTLE & KINNEY LLP**
By:
  /s/ Keith Fichtelman_____
Keith Fichtelman
Attorneys for Plaintiff
Bohbot, LLC